

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-28-2008

# Martinez v. Rapidigm Inc

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-2274

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Martinez v. Rapidigm Inc" (2008). *2008 Decisions.* Paper 614.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/614

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-2274
_____

JACQUELINE B. MARTINEZ,

Appellant

v.

RAPIDIGM, INC.

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 02-cv-01106)
District Judge:  Honorable Joy Flowers Conti
_____

Submitted Under Third Circuit LAR 34.1(a)
June 5, 2008

Before:  FISHER, JORDAN and VAN ANTWERPEN, *Circuit Judges*.

(Filed: August 28, 2008 )
_____

OPINION OF THE COURT
_____

FISHER, *Circuit Judge*.

Jacqueline Martinez appeals the District Court's order granting summary judgment

in favor of Rapidigm, Inc. ("Rapidigm") on all three of her claims.  Her claims included:

(1) gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§§ 2000e-2 *et seq.* ("Title VII") and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. Ann. §§ 951 *et seq.* ("PHRA"); (2) retaliation for protected conduct under Title VII and the PHRA; and (3) wrongful discharge under state law. For the reasons set forth below, we will affirm the order of the District Court.

I.

We write exclusively for the parties, who are familiar with the factual context and legal history of this case. Therefore, we will set forth only those facts necessary to our analysis.

In October 1998, Rapidigm hired Martinez, an attorney, as its Manager of Immigration Services. In this position, she was responsible for ensuring that Rapidigm was in compliance with federal immigration laws and regulations. Initially, she oversaw Rapidigm's participation in the federal green card program, which allows foreign nationals to acquire permanent residency status in the United States. In March 2000, at her request, she also became responsible for Rapidigm's participation in the federal H-1B program, which allows foreign nationals to remain in the United States to work on a temporary basis.[1]

In August 2000, Martinez sent two emails to Rapidigm's Chief Executive Officer, Lew Wheeler, in which she expressed her view that the H-1B program was in full

_____

[1]Prior to March 2000, Rapidigm used an outside consultant, John Tatalovich, for its work with the H-1B program. However, beginning in September 1999, Martinez refused to work on H-1B petitions unless she had full responsibility for the program.

2

compliance. Nevertheless, everyone – Martinez, Wheeler, and her direct supervisor, Ravi Amble – agreed that Rapidigm needed to hire someone to manage the H-1B program, particularly due to the extensive demands on Martinez. Rapidigm hired John Tatalovich, who had previously worked as an outside consultant for Rapidigm on the H-1B program. It announced that he would begin working on September 11, 2000. Martinez did not agree with the decision to hire Tatalovich.

On September 1, 2000, Martinez sent an email to all of Rapidigm's recruiters and Human Resources personnel, informing them that "in the interim" until Tatalovich started, they should forward any correspondence regarding H-1B petitions to the paralegal on the "H team," not to her or her assistant. In addition, she copied the email to Wheeler, Amble, and Paul Freudenberg, Rapidigm's President. Amble called Martinez, and the two had a heated exchange. Amble told Martinez that Rapidigm would not be implementing her plan for compliance with the H-1B program – a "homebasing" program, in which consultants would be "homebased" at a location for at least one day to ensure the accuracy of the H-1B petition. Martinez informed Amble that she would no longer sign H-1B petitions because she could not verify their accuracy, and she did not want to perjure herself. She further stated that, if she learned of fraudulent activity in the future, she "may have a legal duty to report that." With regard to signing the H-1B petitions, he responded that she should "tow [sic] the line," and she was being "insubordinate." Finally, he asked her, "who did [she] think [she was], . . . the Queen?"

Later in the day, both Wheeler and Freudenberg told Martinez that she should not sign any petitions, and she testified that she was never again asked to sign petitions.

On September 8, 2000, Martinez received an email from the Director of Human Resources, Coleen Sullivan, informing her that several employees had complained of a remark Martinez made during a meeting on August 31, 2000. Sullivan asked Martinez to refrain from similar conduct in the future. In response, Martinez stated that she was unaware that she had made an offensive comment. She then sent a second email to Sullivan, in which she filed a formal complaint against Amble based on their telephone conversation.

Sullivan responded to Martinez on September 27, 2000. She informed Martinez that the complaint against Martinez stemmed from her "reference to the office space as being akin to an environment where a female member of [Martinez's] staff could perform 'lap dances' to a male member of the staff allowing him to place bills 'in her g-string.'"[2] She further stated that Martinez's discussion with Amble around the same time did not influence the report, which Martinez had opined in her complaint against Amble. Finally, Sullivan stated that she had investigated the conversation with Amble, and she encouraged Martinez to report any future incidents.

Two days later, Martinez filed a "formal complaint" against one of her colleagues, Mark Faurie, based on two comments he made during the month of September. On one

---

[2]Martinez does not dispute that she made this statement.

occasion, Faurie commented that Martinez was "enforcing [her] Second Amendment rights . . . the right to bare arms," referring to her sleeveless shirt. On another occasion, Faurie responded to Martinez's assistant's complaint of fatigue by stating that, "if [he] had known that [Rapidigm would] be hiring such good-looking women, [he] would have kept the couch."

In February 2001, Rapidigm began examining the efficiency of its Immigration Department and concluded that it was not running as efficiently as possible due to the separation of the green card and H-1B groups. In May 2001, it sought a "Request for Proposal" from immigration attorneys to determine alternate ways in which to meet its needs and comply with the immigration laws. Reed Smith LLP ("Reed Smith") submitted a proposal, suggesting (1) outsourcing all work; or (2) retaining five or six paralegals who would work under the oversight of attorneys at Reed Smith. It further suggested reorganizing the green card section first, and then turning the focus to the H-1B section.

On August 1, 2001, Rapidigm terminated Martinez (as well as three other employees of the green card section).[3] On June 20, 2002, Martinez instituted this litigation in the District Court for the Western District of Pennsylvania, asserting three claims: (1) gender discrimination under Title VII and the PHRA based on a hostile work

_____

[3]Tatalovich resigned the next day, effective August 15, 2001. In October 2001, at the suggestion of Reed Smith, Rapidigm hired Julie Shymansky as its Director of Operations, Immigration Services. Reed Smith continues to provide oversight to Rapidigm's Immigration Department.

environment and her termination; (2) retaliation under Title VII and the PHRA; and (3) wrongful discharge under state law. Rapidigm filed a motion for summary judgment on all three of these claims. On March 29, 2007, the District Court granted the motion for summary judgment in favor of Rapidigm. Martinez filed this timely appeal.

## II.

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367(a), and we have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over a District Court's decision to grant a motion for summary judgment, viewing the facts in the light most favorable to the non-moving party. *Moore v. City of Phila.*, 461 F.3d 331, 340 (3d Cir. 2006). Summary judgment is proper if "there is no genuine issue as to any material fact, and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

## III.

### A.

Martinez argues that the District Court erred in granting summary judgment in favor of Rapidigm on her gender discrimination claims. First, she argues that she could demonstrate, as a matter of law, that Rapidigm violated Title VII because its hostile work environment constituted gender discrimination. For Martinez to succeed on her claim, she must demonstrate that: "(1) [she] suffered intentional discrimination because of [her] sex, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally

6

affected [her], (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of respondeat superior liability."[4] *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001).

For the purposes of this analysis, we will assume that any discrimination Martinez suffered occurred "because of" her gender, and thus, we must examine whether, under the totality of the circumstances, the alleged harassment was sufficiently severe or pervasive to constitute a hostile work environment. *See Jensen v. Potter*, 435 F.3d 444, 452 (3d Cir. 2006). In doing so, we consider the following factors to determine if the harassment was sufficiently severe and pervasive: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

Martinez asserts that the harassment she endured during her three-year tenure at Rapidigm consisted of the following: on one occasion, Amble berated her on the telephone for twenty minutes during which he asked her if she thought she was "the Queen"; Faurie's comments regarding her right to "bare arms" and the couch; she was initially not invited to attend a conference in Las Vegas, Nevada (but after asking, she received an invitation and went to the conference); she overheard comments of a sexual

---

[4]The analysis is the same under Title VII and the PHRA. *See Weston v. Pennsylvania*, 251 F.3d 420, 425 n.3 (3d Cir. 2001).

nature about another female attorney at a Christmas party; and a few other similar comments. However, the events she alleges do not go beyond "[o]ccasional insults, teasing, or episodic instances of ridicule[, which] are not enough." *Jensen*, 435 F.3d at 451. Therefore, we conclude that she did not suffer severe and pervasive harassment. *See Jensen*, 435 F.3d at 452 (concluding that severe and pervasive harassment existed due to the "pounding regularity" of "retaliatory insults two to three times per week for 19 months," physical threats, and property damage to the plaintiff's vehicle).

Moreover, Martinez cannot demonstrate that she subjectively perceived the work environment at Rapidigm as hostile or abusive due to her own conduct. The District Court succinctly described Martinez's conduct while at Rapidigm: "[s]he used words like 'bitch' to describe herself in emails, mentioned the potential for a 'lap dance' in public, placed a colleague's picture on an internet dating site, and sent explicit, obscene and shocking email correspondence of a sexual nature to colleagues within the company." We further note that this shocking email correspondence did not consist of one or two email forwards of a questionable nature, but instead constitutes over one-hundred fifty pages of this record on appeal and contains explicit words and images. Where the plaintiff contributes the same type of conduct of which he or she is complaining to the employer's work environment to the degree that Martinez has, we conclude, as a matter

8

of law, that the plaintiff would not find the work environment hostile or abusive.[5]

Therefore, Martinez could not demonstrate a prima facie case for her hostile work environment claim.

Second, Martinez argues that she could demonstrate, as a matter of law, that Rapidigm violated Title VII by terminating her due to her gender. Martinez meets the requirements for her prima facie case under the burden-shifting test applicable in Title VII cases because (1) she is a woman, and thus, a member of a protected class (gender); (2) she was qualified for the position she held; (3) Rapidigm terminated her position; and (4) Rapidigm "retained employees who do not belong to the protected class." *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 n.4 (3d Cir. 2006). In turn, Rapidigm met its burden of production in establishing a "legitimate, nondiscriminatory reason" for terminating Martinez's position. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). That is, Rapidigm sought a proposal to run its Immigration Department more effectively, and attorneys from Reed Smith suggested reorganizing the department so that its attorneys oversaw the work of five or six paralegals.

Thus, the issue is whether Martinez demonstrated "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

---

[5]We reject Martinez's argument that this conclusion is a credibility determination that only a jury can make.

9

133, 143 (2000). To do so, Martinez must present evidence from which a reasonable factfinder could infer that the reason was "a post hoc fabrication" or "did not actually motivate the employment action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (internal citation omitted). Martinez points to Wheeler's statement that he and Amble made the decision to terminate her, that Tatalovich was not terminated the same day she was, the "ongoing harassment" discussed above, and petty instances of disparate treatment regarding the mail, supplies, space heaters, and new chairs. She also alleges that Rapidigm treated the complaint she filed against Amble differently than it did the complaint filed against her for the "lap dance" comment. However, we conclude that these instances do not demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that a reasonable factfinder could find that Rapidigm's decision to terminate her was a pretext for gender discrimination against her. *Fuentes*, 32 F.3d at 764.

Therefore, the District Court did not err in granting summary judgment in favor of Rapidigm on her Title VII and PHRA claims for gender discrimination.

B.

Martinez also argues that the District Court erred in granting summary judgment in favor of Rapidigm on her claim of retaliatory discharge in violation of Title VII. For Martinez to establish her prima facie for this claim, she must demonstrate that: (1) she engaged in protected conduct; (2) Rapidigm took an adverse employment action against

10

her; and (3) a causal link exists between her protected conduct and the adverse employment action. *See Moore*, 461 F.3d at 341. The burden-shifting framework again applies, and Rapidigm must present a legitimate, non-discriminatory reason for its decision, which as we have decided above, it has. *See id.* Thus, Martinez must also demonstrate pretext, that is, she "must be able to convince the factfinder both that the employer's proferred explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* at 342 (internal quotation marks and citation omitted).

Martinez claims that Rapidigm terminated her because she reported Amble's and Faurie's inappropriate conduct. Regardless of whether Martinez can demonstrate that her reports constituted "protected conduct," she cannot demonstrate the causal connection between her reports and her termination. To establish a causal connection, she would need to demonstrate either (1) a temporal proximity between the two events that is "unusually suggestive" of retaliation, *see Williams v. Phila. Housing Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004); or (2) timing plus other evidence, which generally includes evidence that the employer engaged in a "pattern of antagonism" with the plaintiff, *see Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 895-96 (3d Cir. 1993). Approximately eleven months separated Martinez's report and her termination, and thus, the temporal proximity is not "unusually suggestive" of retaliation. *See Williams*, 380 F.3d at 760 (two months is not "unusually suggestive"). Additionally, the "pattern of antagonism" that Martinez alleges, which essentially amounts to petty intra-office

11

squabbles, does not amount to the type of antagonism we have recognized. *See Robinson*, 982 F.2d at 895 (concluding that a "pattern of antagonism" existed because the employer engaged in a "constant barrage of written and verbal warnings . . ., inaccurate point totalings, and disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until his discharge").

Moreover, Martinez cannot demonstrate that Rapidigm's "proferred explanation was false, and that retaliation was the real reason" she was terminated. *Moore*, 461 F.3d at 342. Therefore, the District Court did not err in granting summary judgment in favor of Rapidigm on her Title VII and PHRA claims for retaliation.

C.

Finally, Martinez argues that the District Court erred in granting summary judgment in favor of Rapidigm on her wrongful discharge claim under Pennsylvania law. In Pennsylvania, the general rule is that an employer may terminate an employee for any reason. *See Geary v. U.S. Steel*, 319 A.2d 174, 185 (Pa. 1974). However, Pennsylvania courts have recognized a public policy exception to this rule. *See*, *e.g.*, *Shick v. Shirey*, 691 A.2d 511, 516 (Pa. Super. Ct. 1997). In predicting how the Pennsylvania Supreme Court would extend this rule, we have examined a Pennsylvania Superior Court decision that "recognized three limited circumstances" of the public policy exception, which include:

> "An employer (1) cannot require an employee to commit a crime [and fire the employee for refusing to do so], (2) cannot prevent an employee from

12

complying with a statutorily imposed duty, and (3) cannot discharge an employee when specifically prohibited from doing so by statute."

*Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 111 (3d Cir. 2003) (internal quotation marks and citation omitted).

Martinez asserts that Rapidigm terminated her because she refused to sign the H-1B petitions, and if she had signed these petitions, she would have violated the Pennsylvania Rules of Professional Conduct and perjury laws. She also asserts that Rapidigm terminated her because she threatened Rapidigm that, if she learned of any unlawful conduct, she would have a duty to report it. We agree with the District Court that where an employer terminates an attorney for acting in accordance with the Rules of Professional Conduct, Pennsylvania courts would recognize a claim for wrongful discharge in violation of public policy.

We further agree with the District Court's analysis that Martinez cannot demonstrate these three limited exceptions. First, Rapidigm did not require Martinez to violate the Rules of Professional Conduct or perjury laws. Instead, both Wheeler and Freudenberg instructed her not to sign anything that made her uncomfortable – even petitions that were lawful. Moreover, even though Amble instructed her to sign petitions (prior to hearing from Wheeler and Freudenberg), she has not demonstrated that any of the petitions she would have signed were unlawful. Her speculation as to their lawfulness is insufficient for us to conclude that any petitions she would have signed would have violated the Rules of Professional Conduct or perjury laws. Thus, Martinez cannot

13

demonstrate that Rapidigm terminated her for refusing to violate the Rules of Professional Conduct or perjury laws. Additionally, Martinez did not report Rapidigm for engaging in unlawful activity (until after her termination), and thus, she cannot demonstrate that she was terminated for reporting Rapidigm. Finally, Martinez does not advance the third theory.

Therefore, the District Court did not err in granting summary judgment in favor of Rapidigm on her state law claim for wrongful discharge.

IV.

For the foregoing reasons, we will affirm the order of the District Court.